Good morning. May it please the Court, I'm Amber Rosen representing the United States in this matter. Ms. Rosen? And I'd like to reserve approximately three minutes for rebuttal, if I may. You may do so, but please watch the clock. It's ticking down in front of you. Yes, thank you. The United States is appealing a District Court suppression of Defendant's and Morandi's statement because Defendant was not in custody when he was interrogated. The District Court misapplied the totality of the circumstances test, and under the de novo standard of review, we ask this Court to reverse. Whether a Defendant is in custody Would you say we have a de novo standard of review, Ms. Rosen? Yes. As to fact findings, historical fact findings, not mixed questions of fact and law, not legal findings, but as to historical fact findings, do we have de novo review or do we have abusive discretion review? On the factual findings, it would be a clearly erroneous standard of review. I think because there was a taped recording of the interview, the facts themselves are not so much in dispute, and the real question was the District Court's conclusion of custody and the way that the District Court applied the law to the facts that we are really Whether a Defendant is in custody turns on whether there's a formal arrest or, more appropriate to this case, whether there's a restraint on the freedom of movement to the degree associated with a formal arrest. And in this case, we believe the answer is that the Defendant was not in custody and that there was not the restraint on freedom of movement associated with a formal arrest. Well, Counsel, one of the concerns I have is that even though he was told that he was not under arrest, he was never told that he was free to leave. Is that something we should be concerned with? Well, it's true that he was not specifically told he was not free to leave, but there's many cases in which the courts have said that that alone is not dispositive. For example, this Court's decision in Baines, this Court's decision in Hudgins, the Sixth Court's decision in Mahan, and the Court's decision in Davis v. Alberts, which I think was a Fourth Circuit case, in none of those cases was the Defendant specifically told that he was free to leave, and yet in all of those cases the Court still found that he was not in custody. What will we do with the words, You'll walk out of here when we're done? Yes. I think the Court needs to look at that in the context in which it was said. What the officer said, and this was right at the outset of the interview, was you're not under arrest, you're not going to be arrested, you're going to walk out of here when we're done. And that's significant, because I think what the officer was trying to do was to assure the Defendant that he wasn't going to be placed under arrest and that he was going to walk free at the end of the interview, regardless of what happened. It wasn't said in a threatening way at all. It wasn't said in response, for example, to a question, can I leave? You know, I think that would have been a whole other, a whole different matter. Instead, it was part of this, you're not under arrest, I'm not going to be arrested. So to that extent, I think the officer was really trying to assure the Defendant that he was not going to be arrested. That type of argument is the perfect argument to address to a trial court who observes the people making the argument, that the tone of voice, the way that the words fit in the context, all go to the issue of what a reasonable, objective person would take from these words. Isn't that what the trial judge should be determining? Well, Your Honor, I still think in this question, it's really a question of how the court interpreted it. And I think because it was based simply on the tape recording of the interview, it wasn't based on any testimony by the officer. It wasn't based on anything he said or any demeanor about his credibility about what it meant. It really was just the words on the tape. And this Court is in as good a position as the district court was to make an interpretation as to what those words meant and to how to take them. And I think also one needs to keep in mind that that alone would not be sufficient to transform the setting in the custodial one when you take into account the totality of the circumstances. The cases are primarily concerned by the fact that there are no other testimonies in the record. So there's no testimony from the appellee or from the investigator or officer involved about that interview? They each did file a written declaration, which is in the excerpts of record. So the court can take that into consideration as well. But that, again, is... Yes. There's no observation of witness demeanor by the district court. That's correct. So when the officer said, when we're done, you're going to walk out of here. You're not going to be arrested. That could mean when we're done right now if you want to leave. Exactly. Or when we're done two and a half hours from now as it took. So it's somewhat ambiguous. Well, I think what's... What that sentence meant. Is there any precedent about how we deal in terms of the in-custody requirement with an ambiguous comment? Well, I think what's in... I think one would be the question in terms of precedent. There isn't... I didn't find a case that specifically dealt with a statement similar to that. But I think it might have a little bit to do with where the burden is placed. We don't believe we believe the burden of showing custody should be on the defendant and that the district court didn't make clear on whom it was placing the burden. So I think to that extent it should be viewed in our favor. Moreover, I think it's not only the burden, but also the fact that the officer said, when we're done. There was no statement in any way to indicate that the officer was the one who was going to decide when the interview was done. The defendant could have said, you know, I don't want to talk or something like that to indicate that they were done. So I think that that is another way in which the court can look at that statement. I think, though, the one... Ms. Rosen, would you please clarify a point procedurally? In light of the motion to suppress, did the government just put this on ice? In other words, the they didn't go ahead and try to prosecute without a resolution of this issue? That's correct. We've taken an interlocutory appeal. I think one thing to keep in mind, especially when looking at the totality of the circumstances, is that the Miranda and its progeny cases are most concerned with whether there's an incommunicado interrogation of individuals in a police-dominated atmosphere. Let me see if I've got something straight. The defendant was in a room with Williams and three other police officers when the statement was made, when we're done, you walk out of here? No, I don't believe that's correct. I think who was present at that point in the interview was the defendant, Detective Williams. I believe Detective Strotsky and Lawrence were also in the room just waiting to go and search the car. So I think that they were in the room at the time. And also the human resources officer was present in the room at the time. From the company? Yes, that's correct. Counsel, you're down to about two minutes. It's your choice, but I just thought I'd remind you. Yes, thank you. I did want to just briefly emphasize for the Court the lack of police domination in an incommunicado atmosphere in this case. The interview took place at the workplace, not at the police station. For the vast majority of the interview, only two officers were in the room, only one of whom was asking questions. They were not in uniform. They did not display weapons. They did not restrain the defendant in any way. They told him he was under arrest. And he was not alone for a good portion of that interview. The human resources officer was there. And as the Supreme Court made clear in Berkmer, the fact that there's someone besides the officers gives the defendant assurance that he won't be abused or browbeated in that situation. An officer also minimizes the officer's ability to use an illegitimate means to obtain a confession. And with that, I will save the remainder for rebuttal. Thank you, counsel. We will hear from the other side. I'm Stephen Shaken for appellee. I'm not usually representing the appellee, and so it looks to me like I won't need my full ten minutes unless the Court has a lot of questions. All right. What's really at issue here is not so much the Fourth Amendment law, but it's really the doctrine and the policies governing appellate review. The district court is charged with the task of determining, based upon the evidence and the totality of the circumstances, whether a reasonable person in a particular defendant's situation would believe they were free to leave. In this case, a motion was filed supported by a declaration and by exhibits. Opposition papers were filed with declarations and exhibits. The Court heard the actual interrogation or questioning, whatever you wish to call it, made factual findings, considered every possible relevant point, and determined that a reasonable person in appellee's situation would not believe they were free to leave at that moment. Mr. Shaken, my question on that is, if the only thing the Court heard audibly was the same digital recording that this panel can hear or looked at affidavits that we can on an in-custody issue. Well, it heard the actual interview itself, which is probably the most important of all the items of evidence. It heard the interview on the digital recording that we have. That's right. That which we have. We're not doubting it was. Well, okay. But if we hear the exact same interview, why does that feature lead us to give any trial charge? Well, merely listening to the interview itself isn't what causes deference. What causes deference is that evidence was presented, whether it was in the form of live testimony or the digital recording and the declarations. This was the evidence that the parties wanted the Court to hear, in the first instance at least. Well, now, did Judge Yelston make any specific findings, other than her conclusion of law, obviously, in granting the motion to suppress? Were there any specific findings of fact made? Oh, yes. There were a number of specific findings of fact made, that the appellee was instructed to go into the conference room, that the door was closed, that he was told he could leave. Well, of course, that was on the record. He was told he could leave. What I'm trying to focus on are facts found by Judge Yelston that were not – that were separate from the DVD. Yes. Well, she made a finding that the statement that when he was told by Detective Williams that they had a warrant to search his vehicle, that that was not correct because the warrant was defective. She made that finding. Well, that doesn't apply to this issue, does it? No, no, no. But except that she's certainly entitled to consider whether the – among the totality of the circumstances and facts, whether or not the officers made misrepresentations in speaking to the appellee, even though it didn't go specifically to this legal point. All right. So she discussed every one of the Kim factors. Now, those five factors include a lot more than just five factors. They include a whole universe of potential factors. Well, help me with the Kim case. What I'm having trouble with there is that Kim involved uniformed police officers, did it not? Yes. And isn't that that much more intimidating than plainclothes investigators that were here? Well, it would depend upon the particular set of facts, the particular situation, because the Kim case discusses whether or not there were officers and how they presented themselves, but it also discusses their purpose, whether they were confronting an individual with evidence of their guilt. So it – certainly uniformed officers in a given situation could be more intimidating than plainclothes officers. On the other hand, where the plainclothes officers present evidence of guilt to the suspect, that would more likely be far more intimidating than the mere presence of a uniform or even of a weapon. It would turn more on – But in this digital interview, I didn't notice them presenting a lot of evidence of his guilt. I mean, they were aware of it and there was comment about what he agreed that he had uploaded. In other words, the police had that information, but it wasn't like an interrogation where they're confronting him with this piece of evidence and that. It's a pretty low-key interview where it's mostly him talking. Well, you know, whether it was low-key or not low-key I think is a factual finding which the district court in the first instance makes. I guess what I would like to hear is your review of the Kim factors. Okay. Do you have any other comments on the total circumstances? Well, the first in the Kim factors, they discussed all of them. First, the language that is used. And in this case, the district court found, based upon not only the appellee's declaration, but the declaration of the human resources manager, that he was instructed to go into the conference room. So it wasn't something that he chose or something that he selected. With regard to the confrontation with the evidence, the district court determined that he was asked about his use of his particular e-mail account and about specific images that were found on the computer. And while they were interrogating him, because it took so long, there was a separate search of his home, and that was telephoned in, and the officers asked him about materials found in his home. So the district court discussed that. In terms of the physical surroundings, the court found that to be neutral. We thought that she was being generous to the government in finding it to be neutral, but she did make a finding. She carefully considered it. The fourth factor is the duration of the interrogation, which, of course, was considered. And in addition to that, the court did consider other factors, such as the initial presentation of the warrant and whether there were false statements. So it did carefully consider all of the Kim factors. And as I said earlier, those factors really are broad enough to cover the totality of the circumstances in any case. Yes. I didn't want to cut off a question, certainly. No, no. I'm just digesting your argument. The government seems to place tremendous import on the fact that the human resources manager was there, but this was not like having a union representative or an attorney or a family member. This was someone who was there to protect the interests of the company and was in fact cooperating with law enforcement. I'm not saying she was right or wrong, but certainly it wouldn't be something that's reassuring to the appellee. In fact, he was terminated shortly after that interview. And finally, I'd just like to conclude by saying that, really, what the government is dressing up a legal argument really in a factual argument. What they're really upset about is that the district court judge gave weight to certain factors that they thought was the wrong weight and considered some factors more important than other factors. That's the district court's job. In order to get to the de novo jurisdiction on the law, in this instance, there should have to be some legally erroneous factual findings. The fact that a different judge could have made a different finding does not support a reversal in this case. And based on that, this one. Scalia, I have one other question, counsel. Who bears the burden of proof or the burden of persuasion on the custody issue? Well, it's unclear in this circuit, but it would appear that the initial burden of persuasion would be with the moving party, as it is in any case. And I think that in this case, by filing a motion and by presenting his declaration and by certain undisputed facts as to what happened, he at least began by bearing the burden of persuasion. And it then shifted to the government to show that under these facts, a reasonable person would think they were free to leave. Thank you. Thank you, counsel. Ms. Rosen, you have some reserve time. Thank you. Not very much time, so I just want to make two very brief points. The first is, I think in this case, the evidence is that the defendant would have – a reasonable person in the defendant's position would have felt free to leave based on the objective circumstances. It was not a police-dominated atmosphere. He indicated his desire to cooperate. He was specifically told he wasn't under arrest. He refused to answer certain questions, which this Court has found to be indicative of a lack of coercion. For example, about 12 minutes into the interview, he was asked his Social Security number, and he refused to provide it. And at the end of the interview, when he asked about counsel, he was given the opportunity to leave and consult one. I think the significance of the human resources officer is it can be sometimes someone who's there to give support, moral support, to the defendant. But in this case, I think it's what the Burke – the Supreme Court talked about in Berkemer, which is simply that when there are nonpolice persons present, it is a barrier to misconduct by the police. So it is very significant that she was there for the first time. Yes. Counsel, I had the distinct recollection that the HR woman left the room fairly early on, so that for much of the interview, just like the two other police who went to the car left. So for much of the interview, it's basically one investigator and Mr. Bassagnani. Is that right? I don't believe that's quite right. It's a little bit hard to tell from just listening to the tape itself. But when you – I think you put that together along with the declarations and you listen to the whole tape. What's clear is that the human resources officer did leave at about three minutes into the interview, and that's when the officer says to Mr. Bassagnani, you know, I didn't tell you, you know, what the search warrant was about because I didn't want to do it in front of her, but now I'm going to tell you. But then she comes back in, and I think that's at around six minutes when the officers also come in and ask him about his keys. And then it's clear that she was there, yes. All right. Counsel, I'm afraid your time has expired. For some reason, the clock isn't working correctly. It is working. I was just trying to answer Judge Gould's question. Oh, no, I understand. I understand. But the clock is not working correctly. I'm sorry. Okay. Would it be okay to just put on one last note to the question he asked? Oh, certainly. You can complete the answer to the question asked by Judge Gould, certainly. Thank you. It's clear, though, that she had come back in because at 45 minutes in the interview, the officer, Detective Williams, asks her to leave and says, you know, I'll call you at the end. And she says, okay. So I believe she was there for the substantial portion from the beginning to 45 minutes and maybe gone for just a couple minutes in there. Okay. And then she's not there from the 45 minutes to the end of the two and a half hours, right? That's correct. That's correct. So she's basically there for the first 45 minutes except for a brief exit. But then after that, she's not there. That's correct. And the officer says he asked her to leave so as not to talk about these matters, you know, what would be considered private matters in front of her. And the defendant made no objection to that whatsoever and, in fact, said he appreciated it at the end of the interview. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Gould, Bea